**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES GORMLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MAGICJACK VOCALTEC LTD., GERALD VENTO, and JOSE GORDO,<br><br>Defendants. | Case No.: 1:16-cv-01869<br><br>Hon. Victor Marrero<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff James Gormley and Lead Plaintiff Samuel Saad Revocable Trust (collectively, "Plaintiffs"), by and through its counsel, individually and on behalf of all others similarly situated, for its Amended Class Action Complaint (the "Complaint") against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, conversations with witnesses, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding magicJack Vocaltec Ltd. ("magicJack"), analysts' reports and advisories about magicJack, and information readily obtainable on the Internet.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons who sold magicJack shares between November 12, 2013 and March 12, 2014 (the "Class Period"), seeking remedies under

the Securities Exchange Act of 1934 (the "Act"). Plaintiffs' claims are asserted against magicJack and certain of magicJack's current and former executive officers and directors.

2. magicJack is a cloud communications company and the inventor of magicJack devices and other magicJack products and services. magicJacks plug into a computer's USB port or a power adapter and a high-speed internet source, providing users with complete phone service for home, business, and travel.

3. During the Class Period, magicJack and certain of its former and current executive officers misrepresented magicJack's expected financial performance. Specifically, Defendants understated magicJack's revenue projection on November 12, 2013, when they told investors that magicJack's fourth-quarter and full year revenue for fiscal 2013 would be less than previously announced. Whereas Defendants previously told investors that magicJack's full year revenue would be upwards of $155 million, Defendants told investors on November 12, 2013, that full year revenue would be between $140 million and $142 million and that fourth-quarter revenue would be only $35 million. In fact, at the time, magicJack was projecting full year revenue of $143 million and fourth quarter revenue of $38 million. Defendants' statements about magicJack's supposed anticipated revenue resulted in a steady decline in magicJack's stock price over the course of the fourth quarter of fiscal 2013. Many investors, including Plaintiffs, sold their shares of magicJack stock during this period.

4. On March 12, 2014, after the market's close, magicJack announced its financial results for the fourth quarter and full year 2013. Among other things, magicJack reported revenue higher than the expected range previously stated on November 12, 2013. Specifically, while Defendants previously told investors that fourth-quarter revenue would be only $35 million, Defendants revealed on March 12, 2014 that magicJack had in fact generated over $38 million—

a 10% increase over what was previously stated. magicJack's stock price increased immediately by more than 20% as a result of magicJack's "beat" on earnings.

5. Defendants' decision to lower guidance was not a mistake, but rather part of a fraudulent plan intended to benefit themselves financially and professionally at the expense of ordinary shareholders.

6. Defendants Gerald Vento and Jose Gordo assumed management of magicJack in early-2013, succeeding magicJack's founding Chief Executive Officer and Chief Financial Officer. With their new positions, Vento and Gordo each received lucrative compensation packages consisting of stock options and restricted stock.

7. Vento's and Gordo's plan was two-fold: by setting investor expectations low, they would be able to appear favorably to investors when they announced blockbuster earnings for the full year; in doing so, they would also be able to generate a significant increase in magicJack's stock price, one that would result in the price of magicJack's stock appreciating over and above the strike prices set out in their compensation packages.

8. The remainder of this Complaint alleges in detail proof of Vento's and Gordo's fraudulent scheme. First, Plaintiffs allege the existence of an internal email written by Gordo confirming that Defendants were internally projecting one number while publicly stating another. Second, allegations from magicJack's former Chief Executive Officer (prior to Gordo) confirm that by the date of Gordo's email, Defendants were able to predict magicJack's full year earnings with extraordinary accuracy due to magicJack's unique revenue recognition practices. Third, in furtherance of Vento's and Gordo's scheme to bolster their professional reputations, Defendants worked with purported analysts to issue promotional articles about the talents of the "new management." And finally, fourth, when magicJack announced its full year earnings on March 12, 2014, after the misleading lowered guidance and two supposed independent analyst reports,

magicJack's stock price increased dramatically, surpassing the exercise prices in Gordo's and Vento's compensation agreements and instantaneously generating hundreds of thousands of dollars.

9. For the reasons stated herein, Defendants are liable to Plaintiffs and the investors it represents in this class action.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Act [15 U.S.C. §§78j(b) and 78t(a)], Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5] and Sections 11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Act [15 U.S.C. §78aa] and Section 22 of the Securities Act [15 U.S.C. §77v].

12. Venue is proper in this District pursuant to Section 27 of the Act and 28 U.S.C. §1391(b) and (c). Many of the acts that constitute the alleged violations of law occurred in this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ, a national securities market located in this District.

14. This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

## PARTIES

15. Plaintiffs sold magicJack shares as set forth herein and in their certifications filed with the Court in connection with the initial complaint (Dkt. No. 1-1) and subsequent motion for lead plaintiff (Dkt. No. 24-1). Plaintiffs' certifications are incorporated herein by reference.

16. magicJack is a corporation organized and existing under the laws of Israel. It maintains its principal corporate offices at 12 Benny Gaon Street, Building 2B, Poleg Industrial Area, Netanya, Insrael 42504.

17. Defendant Vento has served as Chief Executive Officer of magicJack since December 2012. Vento is a director of magicJack's board of directors.

18. Defendant Gordo has served as Chief Financial Officer of magicJack since May 10, 2013. According to the press release issued by magicJack on May 9, 2013 announcing Gordo's appointment as Chief Financial Officer, Gordo joined magicJack in early 2013.

19. Vento and Gordo are collectively referred to herein as the "Individual Defendants."

20. magicJack and the Individual Defendants are collectively referred to herein as "Defendants."

21. Under the terms of Vento's and Gordo's respective employment agreements, they would receive significant equity grants in the form of options and restricted stock. Vento's agreement provided him with stock options to purchase 722,782 shares of the Company's common stock at an exercise price of $14.95 per share. In addition, Vento's agreement provided him with 80,267 restricted shares. Vento's options and restricted shares vested once per year over the course of three years, *i.e.*, 33 1/3% each year on December 31, 2013, 2014, and 2015.

22. Gordo's agreement provided him with stock options to purchase 256,151 shares of the Company's common stock at an exercise price of $17.63 per share. Gordo's agreement also provided him with 27,634 restricted shares. Gordo's options and restricted shares vested in the

same manner as Vento's options and restricted shares. In addition, when Gordo became magicJack's Chief Financial Officer, magicJack granted him 39,880 options at a strike price set of $17.63 per share and 52,356 restricted stock units in exchange for past services rendered while he was a consultant for magicJack (prior to becoming Chief Financial Officer). Gordo's additional grant for past services rendered had the same vesting schedule as his other awards, except that vesting of the restricted stock units was contingent upon magicJack's stock price being equal to or greater than $16.29 per share.

## SUBSTANTIVE ALLEGATIONS

### Background

23. magicJack is a cloud communications company and the inventor of the "magicJack" devices and other "magicJack" products and services. "magicJacks" plug into a computer's USB port or a power adapter and a high-speed internet source, providing users with complete phone service for home, business, and travel.

24. magicJack's founder and creator was Dan Borislow. Borislow created the technology behind magicJack product as well as the corporate organization that became magicJack. Borislow served as magicJack's Chief Executive Officer from July 16, 2010 through January 1, 2013, at which point in time Vento succeeded Borislow as Chief Executive Officer. Following his resignation, Borislow remained a consultant with magicJack.

25. magicJack's Chief Financial Officer prior to Gordo was Peter Russo. Russo served as magicJack's Chief Financial Officer from its inception in July 2010 through May 10, 2013, at which point in time he was replaced by Gordo. Following his resignation, Russo served as a consultant for magicJack. Russo's consulting agreement with magicJack required significant work on his part during the initial transition of his position to Gordo. magicJack extended Russo's consulting agreement by one year.

26. magicJack sells its "magicJack" devices to retailers, wholesalers, and directly to consumers. These sales generate revenue, which magicJack amortized over six- or twelve-month periods at all relevant times herein. Accordingly, magicJack would recognize only portions of the revenue it received from sales of its "magicJack" devices in any given month, as the full amount of revenue would not actually be recognized by magicJack until the completion of a six- or twelve-month period (depending on the "magicJack" device sold).

27. magicJack's revenue recognition practices allowed magicJack to predict revenue with extraordinary accuracy. Sales generated in the earlier part of a fiscal year produced even and steady revenue throughout the remainder of the year as the revenue was spread across its six- or twelve-month recognition period. Accordingly, as explained by Russo, magicJack could virtually guarantee the amount of its full year revenue in the latter months of any fiscal year.

28. magicJack's chief officers developed the projections at magicJack. While Borislow and Russo were serving at magicJack, Borislow, Russo, and Greg Wood (Chief Technology Officer) would develop the projections by offsetting magicJack's foreseeable revenue with various expenses such as marketing costs. Borislow and Russo would develop "waterfall" charts to track actual progress against early estimates. By mid-November, magicJack's full year revenue estimate would be "relatively spot on," according to Russo, because the only remaining revenue for the fiscal year was revenue from earlier sales that had not yet been recognized. Significantly, according to Russo, there is no significant sales event after November in any fiscal year; holiday shopping does not produce revenue for magicJack until after the end of the fiscal year on December 31. As explained by Russo, the only revenue not already known and accounted for by November in any fiscal year is revenue from potential sales that magicJack might generate during the month of November and the known revenue relating to pre-existing sales that was amortized into December.

29. In Russo's experience as the original Chief Financial Officer of magicJack, Russo was able to accurately predict full year earnings by the third quarter of any fiscal year. By the third quarter, magicJack would know the inventory levels of its retailers as well as how much revenue was yet to be recognized due to magicJack's revenue recognition practices. According to Russo, magicJack was historically able to predict its full year earnings with "spot on" accuracy as of September in any fiscal year—and increasing in accuracy thereafter in October, November, and December.

**The Material Misrepresentations and Omissions**

30. In an email dated September 18, 2013, from Gordo to Borislow and Vento, Gordo stated that magicJack management was projecting $143 million in revenue for fiscal 2013 based upon magicJack's actual performance over the preceding two months.

31. On November 12, 2013, magicJack issued a press release announcing magicJack's financial results for the third quarter of 2013 (the "3Q13 Press Release"). The 3Q13 Press Release also provided investors with guidance concerning magicJack's fourth quarter and year end results for fiscal 2013. In pertinent part, the 3Q13 Press Release stated as follows:

> FY 2013 Financial Guidance:
>
> As of November 12, 2013, magicJack is providing the following guidance for the full-year 2013:
>
> - ***Net revenues: Total net revenues for the full year 2013 are projected to be in the range of $140 and $142 million***.
> - Adjusted EBITDA: Adjusted EBITDA for the full year 2013 is projected to be in the range of $52 and $55 million.
> - Effective tax rate: For the full year 2013 the effective tax rate is expected to be approximately 32.9%.

(emphasis added)

32. Also on November 12, 2013, magicJack held a telephone conference call with analysts to discuss its third quarter results (the "3Q13 Conference Call"). During this call, Gordo made false and misleading statements about magicJack's projected fourth quarter revenue. Gordo stated, in pertinent part, as follows:

> Turning to our financial outlook for the full year 2013, ***we expect total revenue to be in the range of $140 million to $142 million*** compared to our previously issued guidance of $155 million to $160 million.
>
> We also expect adjusted EBITDA for the year to come in at the high end of the range we previously guided of $52 million to $55 million.

(emphasis added)

33. During the question and answer period of the 3Q13 Conference Call, Tim Horan (stock analyst for Oppenheimer & Co.) questioned Gordo at length over magicJack's decrease in guidance. The pertinent portion of the 3Q13 Conference Call is as follows:

> <Q Tim Horan> And lastly, your fourth quarter guidance seems a touch illogical. I mean, you're kind of calling -- on EBITDA, if you go to the higher end of your EBITDA, you're talking about a 40% sequential decline, I think, and you're looking for sequential declines in revenue that are pretty substantial also. Is there -- could you give us a little bit more color on what's going on with the revenue maybe? And I know you're increasing the advertising spending. But, I guess you're talking, to hit the higher end, you'd have to see spending increase in the quarter by $4 million or $5 million at least.
>
> <A Jose Gordo> Sure. So, what do you have us at for Q4 and for top line?
>
> <Q Tim Horan> Well, I think to hit the midpoint of your guidance, you'd have to be down about $2 million sequentially. And I think to hit the top line on EBITDA, you'd have to be down about $4 million sequentially. I don't have it in front of me, sorry.
>
> <A Jose Gordo> ***Yes. Yes, I mean, I think the revenue -- what we put out is $140 million to $142 million, right? And we're at $105 million now. So, I think that would tell you that we'd be $35-ish million in the fourth quarter, which is kind of where we are.***

(emphasis added)

34. The above statements (identified in emphasis) were false and/or materially misleading. While magicJack and Gordo publicly stated that they were anticipating between $140 million and $142 million in revenue for fiscal 2013, magicJack, Gordo, and Vento had in fact internally forecasted fiscal 2013 revenue of $143 million.

35. magicJack's revenue for the nine-month period ended September 30, 2013 was $105,312,000, meaning that magicJack and Gordo appeared to be expecting only $35 million in additional revenue for the remainder of the year (which, as of November 12, 2013, consisted of approximately six weeks). This was false and/or materially misleading, however, as Defendants were internally forecasting $143 million in revenue for fiscal 2013, which translated to fourth-quarter revenues of $38 million—a 10% increase over the publicly-stated forecast.

36. magicJack's and Gordo's fake projection was material to analysts and investors. On November 13, 2013, Tim Horan, the same Oppenheimer & Co. analyst that had questioned Gordo concerning the forecast during the 3Q13 Conference Call, released a report discussing magicJack's guidance (the "Oppenheimer Report"). The Oppenheimer Report was titled "Weak 3Q/Guidance, but Management Transition Now Firmly in Place," and stated in pertinent part that "the flat sequential revenue guidance in 4Q [was] discouraging." The Oppenheimer Report also reproduced the November 12, 2013 projection, indicating that magicJack was anticipating $35,213,000 in revenue for the fourth quarter of fiscal 2013.

37. Investors also looked unfavorably upon magicJack's revenue guidance. Following Defendants' financial earnings reports for the third-quarter of fiscal 2013 and forecasts for the remainder of fiscal 2013, magicJack's stock price steadily declined from $12.51 per share on November 13, 2013 to $11.91 per share on December 31, 2013.

**The Truth Emerges**

38. On January 6, 2014, analyst Greg Miller published a report on magicJack (the "Miller Report"). The Miller Report was based on substantive contacts and communications with Gordo and Vento. The Miller Report told investors that magicJack's share price would improve as Borislow's involvement with magicJack decreased. The Miller Report's statements about magicJack's potential for share price appreciation were exaggerated and intended to support Gordo's and Vento's efforts to inflate the stock price upon magicJack's announcement of earnings scheduled for March 12, 2014. On January 6, 2014, magicJack's stock price closed at $13.00 per share, a 7% increase to its closing price the previous trading day on heavy volume.

39. On February 7, 2014, the following month, another analyst by the name of Whitney Tilson issued a similar report praising the benefits of magicJack and its new management (the "Tilson Report"). The Tilson Report was based upon interviews with MagicJack and its new management, Gordo and Vento—Tilson states that he "met three times with the new company management team (which has only been in place for a fow months without interference from the founder and former CEO)." The Tilson Report states further that "[m]agicJack's problems – spotty customer service, unsophisticated marketing, unprofessional web site, and the tendency to manipulate the stock – were all attributable to the former CEO [Borislow], and are rapidly being fixed." The Tilson Report, just like the Miller Report, was intended by Gordo and Vento to "prime the pump" in terms market expectations and reactions in response to magicJack's upcoming March 12, 2014 earnings announcement—an event that Gordo and Vento knew would be a great success and boost to magicJack's stock price. magicJack's stock price increased 18%, to close at $16.25 per share, on heavy volume the day after the release of the Tilson Report.

40. On March 12, 2014, magicJack announced its fourth-quarter and full year earnings for fiscal 2013 in a press release (the "4Q13 Press Release"). The 4Q13 Press Release revealed

that magicJack's revenue for the fourth quarter and year was $38.2 million and $143.5 million, respectively.

41. magicJack's fourth quarter and full year earnings for fiscal 2013 were approximately 10% greater than the guidance magicJack and Gordo gave investors on November 12, 2013 and consistent with the projections provided to Borislow on September 18, 2013.

42. magicJack's fourth quarter and full year earnings for fiscal 2013 were almost exactly as predicted by Defendants in September 2013 in Gordo's email to Borislow and Vento.

43. On March 12, 2014, Defendants also hosted a conference call with investors to further discuss magicJack's fourth-quarter and full year earnings (the "4Q13 Conference Call"). Defendants congratulated themselves during the 4Q13 Conference Call and touted magicJack's accomplishments in terms of beating the November 12, 2013 projection. In pertinent part, Vento stated the following:

> So let's turn to some of the key financial and operating metrics that highlight our Q4 and fiscal year 2013 results. We delivered our highest revenue quarter for all of 2013, generating $38.2 million in revenue, an increase of 8% from the third quarter. We exceeded our revised forecast, with revenues of $143.5 million for fiscal year 2013. We delivered on our promise to grow our renewals business. For the quarter, we grew renewals -- which are categorized as access rights revenue -- to $14.8 million, the highest quarter in [magicJack's] history. This represents a 23% increase on a year-over-year basis.

44. Gordo, similar to Vento, also applauded magicJack's new management for beating the November 12, 2013 projection. In pertinent part, Gordo stated as follows:

> Starting with the P&L for the quarter, we had our highest revenue quarter of the year, generating total GAAP net revenues of $38.2 million, an increase of 7% compared to the third quarter. The quarter-over-quarter increase was primarily due to revenues from the launch of the new magicJack PLUS late in the second quarter. Revenues for magicJack sales for the quarter were $15.1 million, up from $13.2 million last quarter. Access rights renewal revenue was $14.8 million, an increase of 23% year-over-year, and up sequentially from $14.6 million in the third quarter.

45. Analysts and investors reacted favorably and immediately to magicJack's fourth-quarter and full year earnings for fiscal 2013. Tim Horan of Oppenheimer & Co. issued a report shortly after magicJack released its earnings. Mr. Horan noted in his report that "4Q GAAP revenues of $38M were 6% above our estimates." The trading price of magicJack's stock jumped from a closing price of $17.53 per share on March 12, 2014 to close at $21.04 per share on March 13, 2014, a single day increase of more than 20%. With regard to the investors that magicJack and Gordo misled into selling their shares following the November 12, 2013 projection, these individuals sustained significant damages in the way of profits they otherwise would have received.

**Scienter Allegations**

46. Defendants acted with scienter when providing the false and/or materially misleading projection to the public on November 12, 2013. In an email dated September 18, 2013, from Gordo (sender) to Borislow (recipient) and Vento (carbon copy), Gordo stated that Defendants were anticipating $143 million in revenue for fiscal 2013 based upon magicJack's actual performance over the preceding two months. Defendants' internal projection did not change from $143 million between September 18, 2013 and November 12, 2013. Nor would it have changed, as magicJack's revenue was largely set by the third quarter of fiscal 2013 due to magicJack's revenue recognition practices. Accordingly, when magicJack and Gordo told investors that magicJack was anticipating fiscal 2013 revenue to fall between $140 million and $142 million and fourth-quarter revenue of $35 million, magicJack and Gordo knew that these forecasts were false and/or materially misleading. magicJack's and Gordo's knowledge in this regard gives rise to a strong, cogent and compelling inference of scienter, as magicJack and Gordo either: (i) intentionally tried to mislead investors when giving the false projection; or (ii) gave the

false projection while recklessly disregarding the risk that it could be materially misleading to investors.

47. Defendants were motivated to provide investors with the false and/or materially misleading projection on November 12, 2013. These motivations related to financial benefits as well as the professional reputations of Gordo and Vento as magicJack's new management.

48. Gordo and Vento each had employment agreements that, in addition to base salaries and bonus compensation, provided for stock options and restricted stock. Gordo's stock options covered 256,151 shares with an exercise price of $17.63 per share. Gordo also received 27,634 shares of restricted stock which vested only if magicJack's stock price exceeded $16.29 per share. According to the terms of Gordo's agreement, one-third of the stock options and restricted stock vested each year over the course of three years with December 31, 2013 as the first vesting date. Vento received the same benefits, except that his options covered 722,782 shares with an exercise price of $14.95 per share and 80,267 shares of restricted stock. Vento's options and restricted stock vested in the same manner as Gordo's options and restricted stock.

49. By perpetrating the fraud described above, Gordo and Vento were able to increase the price of magicJack's stock to a price at which their restricted stock units would vest. magicJack's stock price steadily declined from $12.51 per share on November 13, 2013 following Defendants' false projection to $11.91 per share on December 31, 2013. After setting low expectations for investors with the false projection on November 12, 2013, Gordo and Vento were able to use analysts to prepare the market for a strong fourth quarter and then announce results on March 12, 2014, that substantially exceeded market expectations. The effect of this scheme was an increase in magicJack's stock price, including an immediate jump in magicJack's stock price from a closing price of $17.53 per share on March 12, 2014, to close at $21.04 per share on March 13, 2014, a single day increase of more than 20%. With a share price of $21.04, Gordo's and

Vento's initial vesting of stock options and restricted stock produced an immediate profit of $897,486 and $2,030,187, respectively.

50. Plaintiffs' allegations on this issue are supported by Defendants' conduct with regard to the two analysts that purported to publish two independent reports about magicJack at different points in time between the November 12, 2013 projection and magicJack's earnings announcement on March 12, 2014. The Miller Report was published after Miller had substantive contacts and communications with Gordo and Vento. The Miller Report told investors that magicJack's share price would improve as Borislow's involvement with magicJack decreased. As support for his conclusion about magicJack's progress, Miller described Borislow's departure from a past company by the name of Tel-Save. Miller's statements about Borislow's involvement with Tel-Save were false and, ultimately, led to Miller correcting certain statements within the Miller Report. The Miller Report's statements about magicJack's potential for share price appreciation were exaggerated and intended to support Gordo's and Vento's efforts to inflate the stock price upon magicJack's announcement of earnings on March 12, 2014. On January 6, 2014, magicJack's stock price closed at a 7% increase to its closing price the previous trading day on heavy volume.

51. The Tilson Report was based upon interviews with MagicJack and its new management, Gordo and Vento—Tilson states that he "met three times with the new company management team (which has only been in place for a fow months without interference from the founder and former CEO)." The Tilson Report states further that "[m]agicJack's problems – spotty customer service, unsophisticated marketing, unprofessional web site, and the tendency to manipulate the stock – were all attributable to the former CEO [Borislow], and are rapidly being fixed." The Tilson Report, just like the Miller Report, was intended by Gordo and Vento to "prime the pump" in terms market expectations and reactions in response to magicJack's upcoming March

12, 2014 earnings announcement—an event that Gordo and Vento knew would be a great success and boost to magicJack's stock price. magicJack's stock price increased 18% on heavy volume the day after the release of the Tilson Report.

52. By engaging in the above-described fraud, Defendants were able to benefit financially as well as professionally by improving their reputations. Gordo and Vento were magicJack's new management, and they stood to benefit significantly from increased investment and awareness as a result of the perception of successful financial performance early in their tenure as CEO and CFO. This was emphasized by their disclosure, through Miller and Tilson, that this financial performance was due to their actions alone, without assistance from Borislow.

**LOSS CAUSATION**

53. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of magicJack's securities and operated as a fraud or deceit on Class Period sellers of magicJack securities by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of magicJack's shares dramatically increased, as the prior artificial depression was removed from the share price. As a result of their sales of magicJack's shares during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**FRAUD-ON-THE-MARKET DOCTRINE**

54. At all relevant times, the market for magicJack's securities was an efficient market for the following reasons, among others:

a) magicJack stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) magicJack filed periodic public reports with the SEC and the NASDAQ; and

c) magicJack regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

55. As a result of the foregoing, the market for magicJack's securities promptly digested current information regarding magicJack from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all sellers of magicJack shares during the Class Period suffered similar injury through their sale of magicJack shares at artificially deflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

56. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein misrepresented the current projections for magicJack revenue as of November 12, 2013 and, therefore, relate to then-existing facts and conditions. In addition, as the November 12, 2013 statements were contrary to magicJack's internal management projections, they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

57. To the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of magicJack who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

58. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who sold or otherwise divested magicJack securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of magicJack, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

59. The members of the Class are so numerous that joinder of all members is impracticable, since magicJack has millions of shares of stock outstanding and because magicJack's shares were actively traded on the NASDAQ. As of August 28, 2015, magicJack had a public float of more than 12.6 million shares issued and outstanding. While the exact number of Class members in unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class and that they are geographically dispersed.

60. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a) whether the Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f) whether the price of magicJack securities was artificially deflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the increase in value of magicJack's stock when the truth was revealed, and if so, what is the appropriate measure of damages.

61. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

62. Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

63. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of the Act and SEC Rule 10b-5
### (Against magicJack and Gordo)

64. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

65. During the Class Period, magicJack and Gordo disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66. magicJack and Gordo violated §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon magicJack's common stockholders during the Class Period.

67. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they sold magicJack's common stock at artificially depressed prices. Plaintiffs and the Class would not have sold magicJack's common stock at the prices they did, or at all, if they had been aware that the market prices had been artificially and falsely depressed by magicJack's and Gordo's misleading statements and/or omissions.

68. As a direct and proximate result of magicJack's and Gordo's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their sales of magicJack common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Act**
**(Against the Individual Defendants)**

69. Plaintiffs incorporate by reference and realleges each and every allegation above as though fully set forth herein.

70. The Individual Defendants acted as controlling persons of magicJack within the meaning of §20(a) of the Act, as alleged herein. By reason of their high-level positions with magicJack, their ownership of magicJack common stock, their participation in and/or awareness of magicJack's operations and/or intimate knowledge of the false and materially misleading statements filed by magicJack with the SEC and disseminated to the investing public, the

Individual Defendants had the power to influence and control (and did influence and control), directly or indirectly, the decision-making of magicJack, and caused magicJack to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had access to: MagicJack reports, press releases, public filings and other information and statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of magicJack and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71. As set forth above, Gordo and magicJack violated §10(b) and Rule 10b-5 by his acts and/or omissions as alleged in this Complaint. Moreover, by virtue of their positions as controlling persons, the Individual Defendants had the power and authority to, and did, cause magicJack to engage in the wrongful conduct alleged.

72. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their sales of magicJack's common stock during the Class Period. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(A) Determining this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class representatives, and designating Lead Counsel as Class Counsel;

(B) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with interest thereon;

(C) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D) Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated: August 19, 2016

**LEVI & KORSINSKY, LLP**

/s/ Adam M. Apton
Nicholas I. Porritt
Adam M. Apton
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

*Attorneys for Lead Plaintiff*
*and Lead Counsel for the Class*